## HITCHCOCK v. VALLEY CAMP COAL CO. et al. *

(Circuit Court of Appeals, Third Circuit. December 7, 1926.)

No. 3458.

Patents ⬯328—Hitchcock, 935,205, for railway frog, held valid and infringed.

The Hitchcock patent, No. 935,205, for railway frog, discloses invention and is valid; also *held* infringed.

Woolley, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Western District of Pennsylvania; Robert M. Gibson, Judge.

Suit in equity by Halbert K. Hitchcock against the Valley Camp Coal Company and the Weir Frog Company. Decree for defendants, and complainant appeals. Reversed and remanded, with directions.

*Rehearing denied February 4, 1927.

Marshall A. Christy, of Pittsburgh, Pa., for appellant.

Alfred M. Allen, of Cincinnati, Ohio, for appellees.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. This case concerns the successful application of electric coal haulage to the rooms of bituminous coal mines. The layout of such mines consists of main entries or haulways, from the entrance to the end of the mine. Depending on the scope of the operation, these entries sometimes extend for several miles, and, varying with the dip of the coal vein, have considerable up and down grades. Flanking such main entries, and on both sides, rooms are laid out at right angles to the entries, and in them the real mining is done. Entrance to the room from the entry is through a passageway, necessarily narrow, so as to afford roof support. The room is mined out on the other three sides into an oblong form, the length extending at right angles from the entry, and the breadth to the supporting solid wall of the rooms on either side. As the miner digs the coal out of the sides of his room, it is put into cars and carried through the room entrance into the main entry or trunk line of the mine, where it was attached to the main entry trains and drawn to the mouth of the slope, or the foot of the shaft, according as the mine was a shaft or slope development. Prior to the use of electric coal haulage, hauling was all done by mules and horses. Such haulage was necessarily slow in movement, limited in power, even on the level, and decidedly so in case of grades. Where the mines were wet, the constant trampage of the mules made the track a series of deep morasses between the ties, which were laid a considerable distance apart. The drivers were usually boys, whose reckless driving of the mules at speed made derailments and accidents on grades quite frequent. In the larger mines the number of mules required and the distances are so great that the mules were kept underground in stables and corrals, to which forage had to be brought, and from which manure had to be taken to the surface. In the frequent stoppage of bituminous mines, due to oversupply, strikes, and shut-down in times of depression, the maintenance of the mules of this haulage system in idleness, was an overhead of substance.

When, therefore, the use of electricity in mines was suggested, it was welcomed for several reasons, among which were an electric power plant outside the mine, which could be

shut down when the mine was not operating; the tremendous gain of motive power in these long main entry hauls of an electric locomotive over a string of mules; the increase of production incident to electrically driven coal-cutting machines, and the elimination of mule haulage. But, while two of these factors, viz. entry hauls and room-cutting machines, were realized, it was soon found that, when the attempt was made to electrically haul the increased production from rooms, a serious obstacle developed. At first sight it would seem that the haulage of a bituminous coal mine was a mere adaptation of surface haulage systems; but such was not the case. In a railroad the usual switch angle is 5°, sometimes running to 10°. In an electric surface road there is the leeway of two broad streets to make the turn. But to switch from the main entry into the room of a bituminous mine there is a 45° angle, and the space to make it in is restricted by the room entrance, which must be narrow to support the surface. Moreover, in railroad locomotives motive power to the driving wheels is imparted by the gradual introduction of steam, while in the electrical mine locomotive it is the instant application of electrical current. Consequently the electric actuated driving wheels, which lacked the locomotive weight to make friction with the rail, required more sand and between the grinding effect of the added sand and the driver wheel spinning, incident to electric current, there rapidly formed grooves or false flanges in the driving wheels. These false flanges, when the abrupt angle switching was made from the entry into the room, caused the regular flange to fail to control at the point of the switch frog, and made the false flange control the motor and derail it. These operative difficulties are set forth in the proofs as follows:

"It is a characteristic of a steam locomotive that the turning force on the drivers of the locomotive is given to it by means of the pressure of steam against the piston in the cylinder, and it is a very comparatively simple matter for a steam engineer to so regulate the pressure against the piston in the cylinder as to not cause sufficient force to be exerted to spin the wheels on the track. This is especially true when the track is dry, and if it is slightly sandy. In electrical haulage, however, especially in small locomotives, such as are used in coal mines, the motors have almost an infinite power when the armatures are standing still, so that, when the operative turns on the current, the first tendency is to cause the armature to rotate. The rotation of the armature generates a counterelectric motive force, which prevents the flow of the current through the armature and exerts a pull on the locomotive; so that it is characteristic of all of these gathering locomotives that, in starting their loads, they always spin the wheels of the locomotive. In order to increase the traction, the locomotives are provided with large sand boxes, which carry a quantity of sharp, dry sand, which is scattered on the rails, and ultimately finds its way between the tread of the driving wheels and the rail. This sand is very sharp, and it has a tendency to very rapidly wear the wheels of the gathering locomotives. As soon as these wheels become more or less grooved, they bite around the side of these small rails, used in the mines, and increase very considerably the tractive power of the locomotive, so that, with a comparatively light locomotive, they are able to get a very high starting pull. * * * By far the greatest number of frogs that are used in coal mines are those which are used at the mouths of the various rooms. A coal mine consists of a pair of entries that are driven through the coal, out of which the coal is hauled, and through which fresh air is forced. At right angles from these entries there are rooms every 30 or 40 feet, according to the character of the roof overlying the coal, which run at right angles to a depth of 100, 200, or 300 feet, and into each one of these rooms it is necessary to run a track, in order to carry the pit cars into the rooms, so that the coal can be loaded into them and to carry the coal out. The angle of these frogs is generally about 42°, I think."

The typical working difficulties resulting from these factors was shown by the uncontradicted proofs in the record in reference to the Creighton mines, as follows:

"At this time they had purchased a gathering locomotive for use in their mine. At this place, mules and horses had theretofore been used to collect the cars from the various rooms throughout the mine, and bring them to a central station, from which they were hauled to the tipple by means of an electric locomotive. Soon after the introduction of these gathering locomotives, Mr. Craig (the superintendent of the mine) began to complain of the difficulty they had in running the gathering locomotive over the track equipment which was then installed in the Creighton mine. The longer they used the locomotive, the worse the conditions in the mine became. So Mr. Craig urged me to come up and see if I could devise some kind of a track equipment that would prevent these wrecks, which were of daily occurrence. I therefore went up into the mine and made a careful

study of the conditions prevailing there, and found that the bulk of their trouble was caused by the fact that the electric locomotive wheels had become badly grooved, and, as they passed through the frogs then in use in the mine, the tendency of the wheels was to follow around the heel or the wing rail of the frog. * * * The best type of frog that the Creighton Coal Company people had been able to secure up to this time was a frog consisting of a piece of boiler plate, to which were riveted bent pieces of rail, forming the heel rails, and a point rail, which was made by welding together two short sections of rails that were cut at an angle, to get the desired angle of the frog. These were all riveted to the boiler plate, and connected to the main track structure by means of fish plates shown in the drawing. In the use of this particular frog, when the grooved wheels would go down through the frog, they would enter onto the heel rail, and would have a tendency to go around and follow the heel rail, not being able to raise themselves over until sufficient pressure had been exerted against the rail on the opposite side of the track to lift the wheel up over the heel rail and past the point. This resulted in pulling the inside flange of the wheel into such a position that it would engage the point of the frog, and roll up over it, thereby wrecking it. Another disadvantage of this structure was that the constant pull of the wheels as they passed over these bent rails soon loosened the rivets which secured the heel rail to the base plate, thereby wrecking the frog structure in such a manner that it would cease to function, even with wheels that were not grooved."

The superintendent of the mine testified: "We put gathering locomotives in the mine—that is, electric locomotives—to haul our coal, and we had trouble with the track equipment we could get. * * * We always had trouble before we got Hitchcock's frog (the patent in suit) to hold our track and hold the rails in place, on account of their being separate. * * * We had constant trouble with the old frogs—cars getting off the track and tearing the frogs up all the time."

As showing that the solution of the difficulties was not one that came from the advance of the art, or from those experienced in mine, or from surface traction or railroad experience, but from the original thinking of one outside the art, the proofs are significant. The Creighton Coal Company was a subsidiary of the Pittsburgh Plate Glass Company and mined coal for its works. The two companies used an office building in common, and Hitchcock, who was developing a system

of sand grading for this company for the manufacture of plate glass, was brought into close contact with Craig, the engineer and superintendent of the coal company, who told him of the difficulties his company was having in electric mine haulage with the result that Hitchcock, after a study of the problem, devised the remedy covered by the patent here in suit.

Without reciting in full the disclosures of such patent No. 935,205, granted September 28, 1909, for a railway frog, it suffices to say Hitchcock's frog effectually overcame the track difficulties of derailment and tearing apart of the track structure, by the use of a cheap, cast iron, unmachined frog, which could be rail-coupled by bolts and without the use of fish plates, and which by supplementary side rail surfaces, provided with an ascending riding surface at one end of the frog and a descending sliding surface at the other, raised and carried a grooved or guttered driving wheel of the mine electric locomotive past the point of the frog and thus prevented train wreckage. The proofs show the practical success of Hitchcock's work. In that regard he testified, and there is no testimony to contradict him, specifically or to the inference of general benefit to the mining art, that can be legitimately drawn from it. He says:

"These first frogs which I put into the Creighton coal mine, certainly not later than 1905, are still in operation in these mines. They functioned perfectly, and they have since then come into general use wherever a first-class haulage system is desired for coal-mining work. The gathering locomotives put into the Creighton mine were among the very first gathering locomotives that were successful in a commercial way; that is, the first locomotives which produced coal cheaper than it was possible to produce it with animal haulage; and this result was very largely due to the character of the track equipment which was installed there. Because of the great success of the gathering locomotives at Creighton, the manufacturers of the locomotives brought most of their intended purchasers to Creighton, to see the locomotives in operation, and the first question that was asked was, 'What kind of a track equipment do you have?' "

In addition to solving the threatening problem of that particular mine, several results of value to bituminous coal mining followed: First, Hitchcock lowered the cost of frogs to one-third or one-fourth of what it had been, and when this one mine used between 200 and 300 such room switches its economic value was in the aggregate a sub-

stantial factor in mine overhead. Second, it indefinitely lengthened the life of room frogs. The proof is that with the old frogs "some of them didn't last but a few months, on account of cars getting off the track and pulling them through and tearing them apart, and others probably would last two or three years," while as to the Hitchcock frog the proof of one witness was that the first frogs "put into the Creighton mines not later than 1905, are still (1925) in operation in these mines," and by another witness, the superintendent and engineer of the Creighton mine, "The original ones were there when I left there in 1918." Third, owing to the simple coupling of the rail to the frog by bolt and the elimination of fish plates, the coupling could be done and the frog installed by common workmen and without track weakening. In that regard the proof is: "One of the great drawbacks to the introduction of gathering locomotives was the cost of track equipment and the unskillful character of the men in the mines who would have to install it. With this particular frog, any workman with a reasonable amount of common sense could install the equipment without any difficulty." And by another witness: "Mr. Hitchcock did work out a cast frog that we could bolt the rail to. We always had trouble before we got Hitchcock's frog to hold our track and hold the rails in place, on account of their being separate."

From our study of the proofs we have reached the conclusion that bituminous electric haulage met a serious obstacle when sought to be applied to the sharp switch angles incident to haulage from rooms to main entry; that this obstacle, unknown before in the mining art, was not in view and not solved by any of the prior patentees or users proven by the defendants, who in their operations have used no such prior devices, but exactly copied Hitchcock; that his solution cheapened to an unusual degree the prior structures, enabled ordinary workmen to install them, greatly prolonged the life of mine frogs, and substituted machine for animal haulage from rooms. We are also of opinion that the improvement so made was one which the advance of the art had not solved, and the ordinary engineering skill of the art had not been able to solve.

In view of these facts, we are of opinion Hitchcock's disclosure was inventive in character, his patent valid, and the decree below should therefore be vacated, and the cause remanded, with directions to enter a decree of validity, of infringement, and for an accounting.

WOOLLEY, Circuit Judge. I am constrained to dissent from the judgment of the court for these reasons, shortly stated:

The case stands on the patent, not on the patentee's testimony. Nowhere in the patent is there reference to track problems in coal mines; nor does the patent intimate that the invention is directed to such problems, or even that the patented device is peculiarly adapted to mine transportation. Coal mines are not mentioned; neither is reference made to problems arising from electric as distinguished from steam locomotion.

The patent is for "a railway track structure," commonly known as a frog, without suggestion or limitation as to its place of use. If valid, a railroad company that uses the frog on the surface of the earth is as guilty of infringement as a mine operator who uses it beneath the surface. It belongs generally in the highly developed art of railroad construction and transportation. This claimed invention is, in the terms of the patent, directed to a problem of that broad art, namely, the habit of wheels to become grooved and to develop false flanges from wear and the consequent tendency of such a wheel to travel around the heel of a frog and cause the flange either to clip the frog's point or take a course on the wrong side of the point. Described roughly, the device of the patent is a frog casting with two elements: One, extending arms shaped to receive the connecting rails without the use of fish plates; the other, a dip or incline of the arms on which a false flange can ride in gradual ascent and pass the joint without shock, with the result that the wheel will likely follow the proper track. Both elements were in a frog known as the Wharton frog in use for six years by the Pennsylvania Railroad Company at Broad Street Station in Philadelphia long before the claimed invention, although fish plates were there used for added strength, and they are found separately in prior patents with and without fish plates. Letters patent No. 276,070 to Pierce, No. 631,808 to Nichols, No. 240,519 to Jeffrey, and No. 267,564 to Morden.

As the functions of these elements in the device of the patent are not joint but wholly separate, prior patents with these separate elements, in my judgment, validly anticipate the claimed invention. So also did the Wharton frog. I do not think that invention can be found in discovering (without specifying or claiming) the peculiar adaptability of this surface rail construction to coal mine transportation. Moreover, the plaintiff patentee consumed three years in procuring a patent (granted in 1909), delayed bringing this ac-

tion until 1920, and prosecuted it to a decree in 1926, nine months before the expiration of the patent. Of course, there is here no question of injunction. Yet the case should be studied and decided as though the plaintiff had brought an action in the youth of the patent instead of in its old age and the patent should be regarded as relating to tracks wherever constructed, whether above the surface, on the surface, or below the surface of the earth. When so viewed, I think the prior art invalidates the patent.